# Federal Defenders
## OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and
Attorney-in-Chief*

*Eastern District*
Peter Kirchheimer
*Attorney-in-Charge*

September 10,  2015

by ECF and Hand Delivery
The Honorable Margo Brodie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**RE:**   **United States of America vs. Andrew Goodman**, 12-CR-614 (MKB)

Your Honor:

I write on behalf of my client, Andrew Goodman, who is presently scheduled to appear before You for sentencing on **September 24, 2015 at 10:00 a.m.**

On January 22, 2015, Mr. Goodman pled guilty, before Your Honor, to Count I of the Indictment, charging him with Coercion and Enticement of a Minor to Engage in Illegal Sexual Activity between October of  2007 and February of  2010.  This plea was entered pursuant to an agreement with the government that included an estimate that his advisory guideline sentence of imprisonment range would be from 87 to 108 months, subject, of course, to the statutory mandatory minimum of 10 years pursuant to 18 U.S.C.  2422(b).

The Pre-Sentence Report (PSR) has come back to advise that the range is, instead, 97 to 121 months. PSR at paragraph 80.  This disparity is  accounted for by the addition of 3 Criminal History Points and a consequent change of Criminal History category from I to II because of conduct with the older brother of John Doe that was included in the New York State conviction and sentence of two years, described at paragraph 30 of the PSR, but was not "accounted for as part of the instant sex offense."  The statutory mandatory minimum of 10 years or 120 months is now within the advisory guideline sentence range of imprisonment and we, respectfully, submit that there is no reason to exceed it.

Beyond that, however, there are a few matters in the PSR that do not change the guideline range but trouble Mr. Goodman enough to raise objections to:

On the first page of the PSR, a New York State Department of Corrections **Detainer** is indicated.  That should not be the case as arrangements were made to satisfy the *Writ* that

brought him into Federal custody in July of 2012 so that he could be paroled by the State of New York on October 4, 2012, as indicated in the next to last section of paragraph 30 of the PSR, and returned back to Federal custody for this prosecution.  I have spoken to the United States Marshals Service and USPO  Patricia A. Sullivan about this and I believe that they agree.  It is, however, critical for Mr. Goodman that it be stricken from the PSR because it could have a very negative impact on where the Bureau of Prisons designates he serve his sentence as well as eligibility for programs that he could avail himself of while there.

Mr. Goodman objects to the assertion in the fourth section of paragraph 30 that. "During pretrial release on [the state court] case, the defendant had his bail revoked."  What in fact happened, as can be seen in the minutes of the proceeding, attached as **Exhibit A**, is that the amount of his bail was increased upon his arraignment on the Indictment in State Supreme Court from what had been set on the Complaint in the Criminal  Court and he was financially unable to make higher amount.

Mr. Goodman also objects to the assertion in paragraph 11 of the PSR that he, "put his penis in John Doe # 2's anus," while conceding that, in fact, it was the other way around.  A review of the charging instruments and pleadings in the State Court case support Mr. Goodman's claim.

Finally, and perhaps most importantly, I am attaching, as **Exhibit B**, a series of letters that I have received from the family and friends of  Mr. Goodman who wanted to show their continued love for and support of him as a person in spite of the illegal behavior that he has engaged in.

Thank You for Your attention to and consideration in this matter.

Respectfully Submitted,

Michael P. Padden, Esq.
(718) 330-1240

cc:   AUSA Tyler Joseph Smith

USPO Patricia A. Sullivan

Andrew Goodman
(MDC) Reg. #81518-053

# Exhibit A

1

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF KINGS:  CRIMINAL TERM:  PART: PD85

3    ----------------------------------------X

4    PEOPLE OF THE STATE OF NEW YORK,          :

5                                               Indictment
                                              : No. 5592/10

6            -against-                         :

     ANDREW GOODMAN,

7                                             :

8            Defendant.                        :
     ----------------------------------------X

9                            320 Jay Street
                             Brooklyn, New York
10                           September 15, 2010

11   B E F O R E:

12       HONORABLE PATRICIA DiMANGO,
              Justice of Supreme Court

13

     A P P E A R A N C E S:
14

         CHARLES J. HYNES, ESQ.
15            DISTRICT ATTORNEY KINGS COUNTY
         BY: RHONNIE JAUS, ESQ.
16           CHRISTOPHER LALINE, ESQ.
         Assistant District Attorneys

17

         FRIED & ROKOSZ, LLP
18            247 West 36th Street
              New York, NY  10018
19       BY: ISRAEL FRIED, ESQ.
         Attorney for the Defendant

20

21

22

23                            PHYLLIS PRICE
                              OFFICIAL COURT REPORTER
24

25

                                                            PP

Arraignment                                    2

1                 THE CLERK: This is number two on the arraignment

2       calendar, 5592 of 2010, Andrew Goodman.

3                 THE COURT:  Appearances.

4                 MS. JAUS:   Office of the District Attorney,

5       Rhonnie Jaus.

6                 MR. LALINE: For the Office of the District

7       Attorney, Christopher Laline.

8            Good morning, your Honor.

9                 MR. FRIED:  Israel Fried, Fried and Rokosz, 247

10      West 36th Street, New York, New York.

11                THE COURT:  Mr. Fried, on behalf of your client,

12      have you received a copy of the Indictment, VDF, and any

13      OFD?

14                MS. JAUS:  Your Honor, at this time I am serving

15      on defense counsel, a copy of the VDF and the Indictment.

16      I am filing a copy of the VDF with the Court.

17                (Handing.)

18           At this time we don't have OFD, but we consent to

19      OFD.

20                MR. FRIED:  I acknowledge receipt, your Honor.

21                THE COURT:  Waive the public reading?

22                MR. FRIED:  Yes.

23                THE COURT:  Client pleads not guilty?

24                MR. FRIED:  Yes.

25                THE COURT:  People answer ready?

Arraignment                                          3

1    MS. JAUS:  Yes, People are ready.

2    THE CLERK: Defendant out on $10,000 cash bail.

3    THE COURT:  Step up, please.

4    (Whereupon, a sidebar discussion was held.)

5    THE COURT:  We had a conference at the bench

6    with regard to this matter. I have been told by the

7    District Attorney, that it is the DA's intent to make a

8    bail application.

9    I asked at the bench what the changed circumstances

10   were, and was given some information. I would ask we place

11   our conversation on the record.

12   Miss Jaus, what are the changed circumstances here

13   which would permit me to grant you your request for a new

14   bail application?

15   MS. JAUS:  Yes, your Honor, thank you very much.

16   Aside from the fact that the defendant was out on ROR

17   status when he was arrested for this case -- and in this

18   felony case, one of the victims that he is accused of

19   molesting, he continued after he was arrested on the

20   misdemeanor case -- we feel there is a strong incentive

21   for the defendant to flee, and he may flee to Israel

22   because he has substantial ties there.

23   We looked through his passport and found, over the

24   last eight years, he made five trips for a substantial

25   period of time.

1      THE COURT:  And this was not presented to the

2   criminal court judge in arraignment, is that it?  And is

3   that the basis for your changed circumstances here?

4      MS. JAUS:  Yes.  And there is more.

5   I did review the minutes from the first arraignment,

6   and it was not brought up.

7   The next thing we recently learned from the

8   community.  Since the defendant's two arrests, he

9   continued to have numerous underage boys come to his house

10   throughout all hours of the night.

11   There is video surveillance which I have viewed,

12   which clearly shows, on three separate nights in August of

13   2010, while he was out on bail in this case, and ROR on

14   the misdemeanor case, several, clearly, underage boys were

15   seen entering and leaving the defendant's house throughout

16   the evening, and well into the morning. The times for

17   these visits include 3:03 a.m., 4:10 a.m., and the dates

18   is August 12th, the 16th, and 23rd.

19   The police are currently in possession of this video

20   tape and investigating these matters. They already

21   confirmed that the age of one of these boys is 16.

22   Again, not only is the defendant a flight risk, but a

23   danger to the community. And in view of all this

24   information, which we believe constitutes a change in

25   circumstances, we are asking for the defendant to be

PP

1    remanded.

2            THE COURT:  The information that you provided is

3    the basis for the bail application.

4        I would like to hear the facts of this case on the

5    record, please.

6            MS. JAUS:  In this case, your Honor, the

7    defendant is charged with sexually abusing, and orally and

8    anally sodomizing one complainant from age 11 to 15, and

9    the second complainant age 13 to 16. The complainants are

10   brothers, and they are neighbors of the defendant.

11           THE COURT:  When was the outcry?

12           MS. JAUS:  The outcry was this past June, first

13   complaint's outcry to the Rabbi.  And the second brother

14   came forward to the police.

15           THE COURT:  Is there any other corroborating

16   information that you have?

17           MS. JAUS:  Yes.  Police executed a search

18   warrant based on information they learned from one of the

19   complainants.  And they found corroborative evidence of

20   the complainant, his personal property, and other evidence

21   in the defendant's bedroom in his house.  Lubricants he

22   used during the sexual act, the clothing of the victim,

23   pictures of the victim, were all found in the defendant's

24   bedroom.

25           THE COURT:  Thank you.

1      THE COURT:  Counsel, let me hear from you.

2      MR. FRIED:  Thank you, your Honor.

3          It seems to me the biggest concern for the People, is

4      the risk of flight.  There is no risk of flight. During

5      the execution of the search warrant, which was done

6      contemporaneously with the arrest on the indictment before

7      your Honor, the DA seized my client's passport.  They had

8      it in their possession, the District Attorney has it in

9      their possession.  He could not leave the country, even if

10     he wanted to, he doesn't want to.

11         He made all his previous court appearances, in both

12     the misdemeanor and felony.  And, he was informed of the

13     felony charges when he was arraigned on the felony

14     charges, and bail set in the amount of $10,000. He has not

15     fled the country since then.

16         His last exit from the country was in 2005.  And the

17     trips in and out of the country to Israel, was because he

18     was attending school there. So, he hasn't had any contact

19     with Israel since 2005. He has been in the country.  There

20     is no risk of flight, he is not going anywhere.

21         He was gainfully employed here, lives and works in

22     Brooklyn.  And, in fact, it is his employers who posted

23     the bail in this case, $10,000 cash. So they stand a lot

24     to lose.  It is a big risk for them.  It is not family, it

25     is his employers. And $10,000 in today's economy is not

PP

Arraignment                                                    7

1   pennies, it is a significant amount of money.  They are

2   not looking to lose their money.  And if they invested in

3   him, they obviously believe he was going to stay here in

4   the country.

5       Additionally, the TPO in this indictment, its

6   obviously a multiple TPO indictment. And 99 percent of

7   these TPOs are prior to the misdemeanor arrest.

8       The original misdemeanor arrest had no sexual

9   charges, whatsoever, it was Endangering the Welfare of a

10  Child, and Harassment, and subsequent to the filing in

11  court.  And I believe, after the arrest in this case, a

12  supplemental complaint was drafted and filed, and added an

13  Attempted Sexual Misconduct. And there were no actions,

14  these are words that are alleged to have taken place

15  between my client and a third individual.

16      As far as people going in and out of his house, it is

17  not a crime, your Honor. Unless he was charged with a

18  crime, there is no change in circumstances. The police are

19  investigating, but they have not made any arrests because,

20  I don't believe any criminal activity has taken place. If

21  that was, in fact, true, they would have discovered that

22  in their investigation.  It would have been a new arrest

23  and, potentially, a supplemental indictment, that hasn't

24  happened.

25      So, to take that into consideration, at this point,

                                                          PP

Arraignment                                                    8

1   is premature.  And the decision today should be based on

2   what we have in front of your Honor. What we have in front

3   of your Honor is D felonies.

4       I am not going to go into the facts of the case.  I

5   would just say, these were not forceful, no one was held

6   against their will.  It is due to statutorily provisions

7   that my client is charged with these felonies.

8       He has no criminal record, so he is going to come

9   back to court. He is going to defend himself.  And I think

10  that $10,000 is substantial. His family does not have the

11  means to put up any additional bail, your Honor. And as I

12  mentioned before, this bail money was put up by his

13  employers.

14      So, I am going to ask your Honor to keep the bail as

15  is.

16          THE COURT:  In response to some of what you are

17  saying.

18      The sex abuse types of offense generally are not the

19  stereotypical type of individuals that you see in the

20  courthouse. And, often, individuals charged with sex

21  offenses, particularly those involving young children, it

22  transgresses all background, social, economic groups, all

23  positions, and jobs.  And it is not put out there because,

24  the individuals charged with these offenses recognize

25  there is an issue, and they recognize within themselves

Arraignment                                                        9

1   the compulsion to engage in this type of activity.  And

2   that is a strong aspect of these cases. It is almost an

3   addictive compulsion on some level, that individuals

4   engage in this.  And it is difficulty for them to deal

5   with.  Sometimes they seek outside help.  Sometimes -- and

6   more often than not -- they, themselves, have been victims

7   of abuse. That, often, can lead to reasons why the

8   allegations are even more credible in a situation where

9   someone who, otherwise, is living a law abiding life -- in

10  other words, not committing street robberies, or

11  burglaries, or drug deals -- can often go unnoticed as an

12  individual engaging in these types of offenses.

13      The argument that they are consensual, I understand

14  where you were coming from with that argument.  And I know

15  you are not minimizing the severity of the age of these

16  individuals.  But the law says, and I think anyone with a

17  child would agree, that 11 years old, which is the age of

18  at least one victim, is not capable of making these types

19  of decisions. In fact, many people older than that, is not

20  able in making these types of decisions. And the

21  allegations, as I understand, young children, young boys

22  all under the age of 16.

23      Now, sometimes people feel this is worth sticking

24  around for, two people who are siblings, as charged in

25  this particular case.  But once they understand there is

PP

1   other individuals out there, whose credibility might not

2   be as questionable, who might corroborate the act, any MO

3   that would be involved, that, certainly in my view, would

4   now increase the likelihood that someone who has already

5   been answering the charges would flee.

6       Now I understand your position, that they have his

7   passport.  But as you know, sir, in this world passports

8   are easily come by, both from the United States and

9   foreign countries, Israeli passports as well.

10      And in regard to the travel back and forth.  I

11  believe your client has a place to go outside of the

12  country where there is no reciprocal, where we would not

13  get that person here through extradition.

14      Based on the facts of this case, the corroboration,

15  and based on the execution of the search warrant, the fact

16  that the District Attorney has other individuals, some of

17  whom have been already reached and willing to corroborate

18  on some level, at least initially with the DA's office,

19  and the serious nature of these offenses and there are 23

20  D felonies on this indictment, many of them are

21  consecutive. And I say that and mean that, as you well

22  know, I feel that the amount of jail that your client is

23  facing under these circumstances, based on the strength of

24  the People's case, warrants an increase in the bail.

25      Bail in this case is now -- I will not remand him

1   based on these charges -- but bail is $1 million cash only

2           Thank you.  Cash only.

3                   MS. JAUS:  We need an extension of the order of

4   protection, please.

5                   THE COURT:  What date, please?

6                   MR. FRIED: Your Honor is not willing to do any

7   bond alternative?

8                   THE COURT:  No.

9                   THE CLERK: Exonerate the old bail?

10                  THE COURT:  The old bail is exonerated.

11          This goes to Part 30; is that correct?

12                  MS. JAUS: 20.

13                  THE COURT:  Part 20 for what date, Counsel?

14                  MR. FRIED:  You tell me.

15                  THE COURT:  Six weeks down.  They will give you

16  Open File Discovery, and the grand jury minutes.

17                  MR. FRIED:  Late October, early November?

18                  THE COURT:  Sure both, either one.

19                  MR. FRIED:  October 25th?

20                  THE COURT:  Does that work for Part 20,

21  everybody?

22                  MR. FRIED:  It is going to Part 30 your Honor?

23                  THE COURT:  There is a discrepancy in that as

24  well. My file says it is a green part case, so that would

25  be Part 40.

                                                              PP

1          MS. JAUS:  Put it into Part 40.  We had gray

2     zone, but whatever you have is fine.

3          THE COURT:  10/25 work for everyone?

4          MS. JAUS:  Yes.

5          MR. FRIED:  It is part?

6          THE COURT:  40.

7          MR. FRIED: Your Honor, I ask my client be placed

8     in protective custody.

9          THE COURT:  Sure.  Protective custody.  Please

10    mark the card.

11            *              *              *

12         Certified to be a true and accurate

13    transcript of the foregoing proceedings.

14

15

16    PHYLLIS PRICE

17    OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25

PP

**Re: Jerrita Baker**

Taia Givens-Childress   to: Scotti, Paul (USANYE), Michael Padden, Margo Brodie   09/10/2015 04:53 PM

3 attachments

M2.jpg    M2.jpg    M2.jpg

Just updating everyone with the latest information I received from the Pretrial Officer in Ohio.

Taia,

Thank you so much for the updated information. I just spoke with Detective Robert Vass of the Columbus Police Department. He advised he spoke with the defendant about an hour ago to inform her of his belief of the credible threat against her life. He stated he informed her he can provide her with protective custody. He related she advised she wants to still stay with her baby's dad (I believe he meant husband) who is allegedly involved in this threat. Detective Vass informed he will reach out again tonight to the defendant and reiterate the credibility of this threat and offer protective custody again. He further stated he will provide me with any updates regarding his contacts with the defendant and any other necessary information.
Sent from my iPhone

On Sep 10, 2015, at 2:37 PM, Scotti, Paul (USANYE) <Paul.Scotti@usdoj.gov> wrote:

Okay, thanks for the update.  Please let me know if you hear of any developments.

Thanks,
Paul

_____

Paul G. Scotti

Assistant United States Attorney
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722
Tel. 631.715.7836 | Fax 631.715.7922

**From:** Taia_Givens-Childress@nyept.uscourts.gov [
mailto:Taia_Givens-Childress@nyept.uscourts.gov]
**Sent:** Thursday, September 10, 2015 2:37 PM
**To:** Scotti, Paul (USANYE)
**Subject:** RE: Jerrita Baker

She has maintained contact with her pretrial services officer in Ohio.  She has also been in touch
with her attorney, so I am not sure why the agent thought she was "in the wind".  We have
accurate contact information for her.

<M2.jpg>

| | |
|---|---|
| From: | "Scotti, Paul (USANYE)" <Paul.Scotti@usdoj.gov> |
| To: | "Taia_Givens-Childress@nyept.uscourts.gov" <Taia_Givens-Childress@nyept.uscourts.gov> |
| Date: | 09/10/2015 02:14 PM |
| Subject: | RE: Jerrita Baker |

Thanks Taia, do you know if she has been located?

_____
Paul G. Scotti
Assistant United States Attorney
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722
Tel. 631.715.7836 | Fax 631.715.7922

**From:** Taia_Givens-Childress@nyept.uscourts.gov [
mailto:Taia_Givens-Childress@nyept.uscourts.gov]
**Sent:** Thursday, September 10, 2015 1:59 PM
**To:** Scotti, Paul (USANYE)
**Subject:** Fw: Jerrita Baker

Hi Paul, I left you a voicemail message and I'm just following up by forwarding
you the email I sent to the defendant's attorney regarding a threat the case agent
found out about.  The agent said he left you a message as well.  Thanks.

<M2.jpg>
----- Forwarded by Taia Givens-Childress/NYEPT/02/USCOURTS on 09/10/2015 01:55 PM -----

From:      Taia Givens-Childress/NYEPT/02/USCOURTS
To:        Michael Padden/NYEG/02/FDO@FDO
Date:      09/10/2015 09:22 AM
Subject:   Jerrita Baker

Hi Mike,

I wanted to touch base with you about your client Jerrita Baker, who is being
supervised by our colleagues in Columbus, Ohio.  I received a call from the case
agent this morning stating there were credible death threats against her. A
confidential informant with the local PD heard a discussion between three men
(one being her husband) about killing her.  He said he also left you a message.
The agent said at this point they have no plans to offer her protection.   I reached
out to her pretrial officer in Columbus and she is aware, but said they have not
been going to the house because  the boyfriend (now husband) is a known
associate of a violent drug ring.  The defendant has been compliant with
supervision.

Not sure how you want to handle this.  If you want to give me a call, I'm in CI
today- 631-712-6406.  Thanks.
<M2.jpg>

# Exhibit B

1460 East 15th Street
Brooklyn, New York 11230
April 12, 2015

Honorable Margo K. Brody
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

Your Honor,

I am writing you regarding Andrew Goodman, who is scheduled to be sentenced for pleading guilty for the crime of Enticing a Minor to Engage in Illegal Sexual Activity.

I am Andrew's mom. We adopted him at 3 days old so I've known him since then. I work in the field of psychiatric rehabilitation and I sit on state and city mental health care and Medicaid Redesign committees. I devote my work hours to helping people who have fallen through the system's cracks.

We live as observant jews who are affiliated with the Yavneh Minyan of Flatbush where my husband regularly attends services.

Andrew was a lively, energetic, curious child who enjoyed much adoration at home and from both sets of grandparents. As a toddler, he developed a nervous stomach and he was very slight. He outgrew that for the most part and used humor to counteract the taunts about his stature.   He made friends easily – his close friends until today are those he made as a child and pre-teen.

The structured environment of the classroom proved to be a challenge for him.  He tested high on IQ tests but by the end of first grade, he couldn't read on an acceptable level.  It was suggested he get psychologically tested and he was diagnosed with ADHD.  While the medication allowed him to focus better, he seemed to lose his personality while on it.  He lamented his lack of academic success – he knew he was bright but the classwork just didn't engage him.  I told him that when he got to college and be able to pick his own classes, he would fly.  And he did…he made Dean's List in 2009.  He was recruited to tutor other students for pay.  He was clerking in a law office.  He was studying for his LSATs.  He was holding down two part time jobs working the overnight shift at residences that catered to the needs of adults on the MR/DD spectrum.

Growing up, Andrew had an unshakable sense of justice.  If he felt that a fellow student was being maligned or mistreated, he would stand up for them.  Needless to say this didn't always endear him to school administration.  One day while in school something happened to another student that really got him worked up.  Rather than express his anger, he left the building.  He began to walk around the block to cool off.  Down the block he encountered an older woman sweeping her leaves.  He took the broom from her and swept up and bagged the leaves for her. (This was shared with me by a teacher who'd followed him out of the building and watch the scene unfold).  By the time he'd finished the chore, he took a deep breath and went back to class, his anger dissipated.

He also has wisdom beyond his years.  His friends would turn to him for serious advice about how to handle various issues.  I remember one evening sitting and talking with my son and the phone rang.  It

was his friend who was just informed that he could skip his senior year in high school and go straight to college.  The young man had already skipped a grade which meant that he would be two years younger than the other freshmen.  My son helped him work through the pros and cons of either action.  The insight he often has belies his years and personal experience.  He's got a good head for sorting these things out.

We were once out shopping when he suddenly said that he'd be right back.  He'd noticed that an elderly woman was struggling with a loaded shopping cart.  I figured he'd help her across the street and come back.  He was gone for many minutes.  When he returned, I asked where he'd been for so long – he helped the woman all the way to her home and took the parcels upstairs for her.

Regardless of how much or how little he earned, he always tithed.  He would set aside 10% of his income and then seek out opportunities to secretly help a person in need.  More than a few times, I'd drive him to an address and he'd slip an envelope with cash through a person's mail slot so as not to embarrass them.

His plan before he was incarcerated was to move in with my aging mom and tend to her needs rather than having an impersonal aide take care of her.

Andrew is bright, sensitive, charming, funny and deeply cared about by his family, friends and supporters.

Yours truly,

Sara Goodman

1460 East 15th Street
Brooklyn, NY 11230

April 15, 2015

Honorable Margo K. Brody
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

Your Honor,

I am writing in reference to Andrew Goodman who is scheduled for sentencing in your court in the near future. I am Andrew's father.  My wife, Sara Goodman, and I adopted Andrew when he was born.

Growing up, Andrew was a bright and very active child. He was always treated with love by his family including all four of his grandparents.

He did "struggle a little" in elementary and high school and was diagnosed  with and treated for ADHD. In spite of this diagnosis, he did go on to receive his associate's degree with honors from Kingsboro Community College and made the dean's list.

During his school days and young adulthood, Andrew formed many close friendships. Also, most of his friends are still "standing by him" and remain strong supporters of his. There were many times that I overheard Andrew giving his friends advice about an important  decision. He did this in a way that I think was quite smart. He would help them weight the pros and cons related to the decision, rather then suggesting to them what to do.

After college, Andrew starting working at several jobs. He started working as a clerk in law office and rapidly was given more responsibility. He also worked as a care giver at a residence for emotionally delayed men. He told me several times that this job was very hard for him due to the high emotionally impact that it had on him. However, me continued to do this job because he cared for these people very much.

I have asked my son directly..."How is it that you did this crime and the New York felonies?" Andrew responded to me, "Daddy, I made a mistake. I know it was wrong and I regret what I did."

Andrew is a bright young man. He continues to be loved and supported by his family and friends.

Yours truly,

Edward Goodman

Letter on behalf of Andrew Goodman.txt

To whom it may concern,

      Andrew is a person whom like everyone else seeks happiness. He is a person
who tries to turn things positive.
He is cheerful, thoughtful, intelligent, caring, optimistic, and outgoing. Andrew
has had a troubled past and has tried so
desperately to get through it and make the best of the situations he had been faced
with. Some choices he has made were not
the best and he understands and sees this now. He is my brother whom I miss dearly
and love very much.  He is a son that
didn't quite meet the expectations of his parents and wasn't understood by them. He
is also someone who was adopted and is trying
to find his place in the world.

      Despite his difficult and troubled past; he is someone who strives for
better. To be better, to live better, to know better, and to do better.
During the time he spent in college he worked hard and managed to maintain a 4.0
average. His goal was to become a lawyer, so
he started working in a lawyers office to build his resume and gain experiance.
After which things went downhill with him going to prison.
I don't know where he will be after prison but I do know that he will strive to put
his life back in order, to come out having learnt from his
time there and to do better.


      Thank you for taking the time to read this letter.

      Sincerely,

            Michelle Goodman

1486 Donwoods Lane
Royal Palm Beach, FL 33411

May 28, 2015

Honorable Margo K. Brody
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

Your Honor,

I am writing on behalf of Andrew Goodman who is scheduled for sentencing in your court. I am Andrew's aunt.

I have always been involved in my community- first as a teacher, then a social worker, now as a pre-school center director. I love helping people grow. I had the pleasure of watching Andrew grow up.

Growing up Andrew was a curious child. He attended school with both secular and religious studies. Andrew enjoyed reflecting on his studies. Some my fondest memories of Andrew are with us debating together over the dinner table on religion, politics, or current events. Andrew questioned everything. He loved a lively discussion- if there was a degree of friendly disagreement- all the better.

Andrew gave to his community. He was involved in working with emotionally delayed young adults. Andrew spoke often about the job. It was taxing for him, but he loved it. As a care giver at a residential facility he had the opportunity to get to know the individuals. It was a rewarding experience.

Andrew and I wrote to each other when he left us for prison. I never asked him what happened. I never offered any words of wisdom -I do not have any. He did, however, write to me about what it means to be a good person. Roughly stated he spoke about life being a series of choices and experiences. Some of them are positive, but certainly not all of them will be so. The good person has made substantially more good choices in their life than any other. Andrew counts himself among the good.

I stand in support of my nephew Andrew Goodman.

Yours truly,

Sheryl Benveniste
Sheryl Benveniste

Honorable Margo K. Brody
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

My name is Seth Schwartz, I am 30, I live in Brooklyn NY, I am an Insurance Underwriter, A business owner, and a father to a 4 year old girl. I was raised in the orthodox community but I did not follow in the religious footsteps of my family, this was a struggle since i was young. I am now affiliated with the organization "OUR PLACE" which is a haven for confused, drug addicted or abused teens going through similar obstacles as i did. My involvement is completely voluntary, and I feel that i have helped many people throughout the years.

Andrew Goodman has been my very close friend since we were 13 years old. We grew up in the same community and had an almost identical upbringing. We met through mutual friends and began to hang out on a regular basis ever since that young age. As the years went on, Andrew and myself only grew closer as friends, we saw each other every weekend and often during the week. We shared friends and social circles, we spent time at each others houses, we went on vacations together, he was with me on my wedding day all day as my watchman. Simply put, Andrew was one of my very best friends.

Andrew has always had the biggest heart one can imagine. I have seen him give what he doesn't even have to others in need. He always seemed to be concerned with going out of his way for someone else. Specifically one time I recall Andrew seeing a woman being attacked by a man, strangers to us, Andrew risked his own safety and jumped in to help the woman. I was shocked as this turned bad for Andrew instantly. In the end the woman got free and Andrew had to suffer for that. Andrew was actually pleased just knowing that he helped her. That is just a minuscule degree of his charitable qualities, wether its giving his money, his time, his safety, it is just who he is. I remember that he was working in a law firm, and he was making a little money for the first time in his life, all he wanted to do was share what he had. Every friends birthday was a huge deal to him, he would take us for dinner, buy us a gift and he did this with a genuine smile. Andrew gave 10% of his income to charity like as if he didn't have a choice even though of course he did. As far as being a good friend, Andrew was always there for his friends, I called him so many times in need of help and he never said no, he was truly dedicated. I cant list every great thing i have watched Andrew do but the list is long and impressive, when it comes to generosity Andrew was by far the best I have seen.

I am stating here that i am fully aware of the crimes which Andrew pleated guilty to "Enticing a Minor to Engage in Illegal Sexual Activity"

I am aware that Your Honor is reading this letter to get an idea of what Andrew was like prior to his incarceration, and that his sentence is in your hands. Andrew has a had a very hard life. His childhood was sad and his later years were always a struggle. He has pushed through and done so many great things in his life. Andrew is not an evil person, no one who has given and done for people what he has, can be. Thank you for reading my letter and i can only hope and pray that for the best.

Sincerely,

Seth Schwartz

Honorable Margo K. Brody
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

To the Honorable Judge Brody,

My name is Avi Davis. i currently live in Los Angeles. I was born in Brooklyn and grew up with Andrew Goodman in the Orthodox Jewish Community in Brooklyn, New York. Knowing Andrew for over 18 years, I have never met another person with a bigger heart. Andrew has been a dear friend of mine through thick and thin. Growing up in the Orthodox Community was hard and a lot of my friends and I were molested by Rabbis numerous times growing up in Brooklyn. Different friends took the trauma differently, some better than others but it affected all of us in some way. Andrew always kept his head high and tried to see the positive in everything. If a friend was in need, Andrew would do everything in his power to be able to help. He never seeked to be "paid back" or to take any credit, he only wanted to be there for others. I remember when we were in Yeshiva in Israel. My birthday came up and everyone forgot, even my parents. I felt so lonely and so alone I just wanted to cry. However, 30 minutes into my depression the door slams open and standing there is Andrew with 3 of my favorite American chocolate bars that were nearly impossible to find in the whole country and he found it for my birthday that everyone else forgot.

Andrew is an amazing person who has helped out so many people, who goes out of his way to put a smile on people's faces. I remember when I was growing up, troubled teens from all over Brooklyn would find shelter under Andrew's roof, looking for a friendly word, a shoulder to cry on or just to ask him advice on life and he was always there to lend a helping hand. Many of my friends would gather there to find comfort amongst each other through the challenging times we faced. Andrew is the type of person, without a doubt, that would give the shirt off his back if someone needed it. I have personally experienced this compassion first hand. I spent many hours upon hours talking with Andrew, and he listened and always stuck by me no matter what. My childhood would have never been the same without him and I miss him dearly. I always felt pressured growing up within such harsh religious rule and don't know if I could have gotten through it without Andrew Goodman. He too struggled, but would always selflessly find a way to make sure his friends were happy. Even while away, Andrew continues to his best ability to do so on rare, limited phonecalls.

I write this letter fully aware that Andrew has plead guilty to Enticing a Minor to Engage in Illegal Sexual Activity. Please, when considering his fate, be fair, that's all I ask. Andrew is a victim himself. In my opinion, it is the orthodox rabbinical system that should be doing hard time, not him.

Thank you so so much your Honor, for taking your time to read my letter it means a lot to me.
Sincerely,
Avi Davis

Honorable Margo K. Brody
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Brody:

I'm writing on behalf of my friend, Andrew Goodman.

My name is Samuel Caller, I'm 29 years old, recently married and have a child on the way. I am currently employed in the field of property construction and development in Newark, NJ.

I've known Andrew for close to 14 years. During the time I've known him, I've found him to be a good friend, always eager to help others even if it involves personal difficulties or costs. He's helped me personally with situations involving my family where he helped mediate between us and helped bring us back together, and also assisted me in giving me a place to live and in being a good supportive friend during some challenging times in my life.

I strongly believe Andrew to be a good and genuine person, who would sooner put others before himself if it meant helping them. He is a good person at heart who would give his friends and even strangers the shirt off his back if they needed something to wear. He has always been hardworking and diligent in his studies – going to school/college and at work. I've known him to be the studious type always reading books or engaging in other intellectual activities and studying various books and papers, actively following politics and world events. He was also involved with helping in the community and worked in a home where he helped with disabled people to go about their daily lives as best they can.

While I really disagree with what he's done, I do believe in my heart that if given another chance he would turn himself around and be of great benefit to the community and society in general because of his good character. He has expressed to me on numerous occasions his sincere regret over his actions and realizes the damage he's caused and how he would never do so again and wishes he could go back and take back his actions. While initially he was very motivated in defending himself against some of the charges, he ultimately came to the decision to not oppose them because doing so would mean causing more distress to the young man by having to come to court and he did not want that at any cost, and would rather accept his punishment so that the young man can have closure and put it behind him and move on with his life.

I believe he has paid for his crime and is a different person today then the person that went in. Any leniency you would show would go a long way for he is a genuinely good person and would not re-offend. I do believe that he should be given a second chance to redeem himself. He has a lot of good to offer and if given the opportunity he would. He has always been a good friend to me and I've personally seen how he helps others.

His actions should not define who he is, for there is so much more to him. Please give him a chance to rebuild his life, I know he will never hurt anyone again because he is extremely sorry and regretful at

what he has done. As a member of the community I think that people should be allowed to atone for their sins and make amends to people they've wronged.

Thank you for the opportunity to write to you and I hope that I have given you a small glimpse and understanding of the Andrew I know, and the person other than appearance would have.

Please find it in your heart to be as lenient as you can for he has served his debt to society and I hope he be given the chance to continue his life and be a productive member of society.


Respectfully yours,

Samuel Caller

Honorable Margo K. Brody
United States District Judge
Eastern District of New York
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Brody

My name is ****, I am a former coworker of Andrew Goodman and currently a law school student.

I first got to know Andrew Goodman between 2008 and 2009, when we both worked at a group home, caring for developmentally disabled individuals. During that time, I observed Andrew's interaction both with us, his coworkers, and with our clients. In terms of his colleagues, Andrew struck me as a fun and friendly person, one was always willing to go the extra mile, willing to take a shift or assignment others would not want to, and just someone whom it was simply pleasant to be around. With regards to our clients, I always noticed he looked out for them, and treated them with the utmost respect and care they deserve and never afraid to stand up if he felt others (both coworkers and superiors) did not do right by them.

When news broke out about Andrew's then-alleged behavior, I was shocked to the core. On the one hand, I could not believe such a person could do such things. On the other hand, if he did do that, he deserves to be punished. It was very hard for me to support him, but I decided to be at his side without putting down his victims. I myself have been involved in various protests and other forms of activism to make sure the Orthodox Jewish communities deal properly with issues of sexual abuse.

During the time his New York State case was going on, I went to visit him in Riker's Island several times, I went to court to observe the proceedings, and made sure he knows his friends did not abandon him for his actions, when he needs that kind of support the most. I even said to him several times that I do believe that if he did what he was accused of doing (before he pleaded guilty, or what he admitted to doing, after he plead guilty) in State Court, he should be treated fairly. The same goes for his federal prosecution in which Andrew has pleaded guilty to the crime of Enticing a Minor to Engage in Illegal Sexual Activity. At the same time, I also believe he should be treated fairly. I have my own opinions about some of the people who brought about the publicity in this case (not the victim's family), and I hope that their hypocrisy will come out publicly one day.

I'd like to share one anecdote Andrew shared with me recently about his experience in jail, and I find it represents Andrew in a light that I find very characteristic of him.

Apparently there was a fight, in which two inmates jumped one "Israeli" inmate, and Andrew tried to break it up. While he was separating the "Israeli" and another inmate, someone hit Andrew in the back of his head, but he was unharmed. One of the inmates, who was in a fighter's stance, made it seem several times like he was going to hit Andrew but backed off and

went back to hitting the "Israeli" inmate in the back of the head. Andrew tried several different times to stop the fight; another inmate grabbed him and held him back, perhaps because he did not want Andrew to get hurt and because one of the aggressors was his friend.

In the end, the "Israeli" inmate went to the hospital, bleeding from an apparent contusion to the back of his head, went into coma for a day, and related the story to Andrew after returning from the hospital, and he was sent back the next day. However, the night he and Andrew spent in the SHU, the "Israeli" inmate had a fever and "wasn't himself." Andrew gave him ibuprophen, read him a book, and he went to sleep.

Andrew told me that he never fought back during the process, only tried to break up the fight and that he was torn between wanting to do the right thing, and just what that meant, and how much force was necessary. In the end Andrew did not get in trouble and perhaps even saved his fellow inmate's life, but he says he wonder if he had done more would the "Israeli" inmate have ended up that hurt or not.

Several elements in this story strike me the most as characteristic of Andrew. First, that he tried to help stop a fight even when he knew he could (and actually did) get hurt. Second, that he did not mind the isolation punishment he got as a result. Third, and that goes his humanity, that he cared for his wounded fellow inmate even though he was the (perhaps indirect) cause for his punishment.

Finally, Andrew also shared with me several times that he wished to go to law school as well, and sometimes I feel like my progress is a way for him to live it vicariously. I also heard that he has been helping out other inmates (both in State and Federal prisons) in the library with their legal research, drafting documents, etc.

In sum, Your Honor, I respectfully ask of you that you treat Andrew fairly, the way he deserves to be treated, to improve both his life, the life of his victim, and to help society. I ask that you give him no less than a punishment he deserves, but also not more than he deserves.


Respectfully,

Anonymous.

Your Honor Judge Brady

I have been Andrews freind for many years. Andrew is a good man and not the monster he is being made out to be. He has a very big heart and would take a bullet for his freinds. He has always been there for me to help & to care. He is a trully good freind. He is deticaded and always looking out for my good. Andrew has a kind heart and has helped me out alot throughout the years. When I had trouble at home - he was there for me, when I was suffering mentally - he was there for me, when I had no one to help me - he was there for me. I see him not like they are making him out to be, but as a kind, caring, nice, loyal freind, who has always been there for me. I remember a while back when my neighbor would come to hang out with my sister & I would (because of my issues) harass her by calling her names. I found out years later that Andrew had convinced her to continue to come over and hang out with my sister and at the same time convinced me to be accepting of her. I found this out years later. He really does care. I know people are making him look like a evil monster & a terible person, but I promise you he is a good person with a good heart. I know him for a long time & he really is a good person. I feel so bad that he is made out to be a monster when I know he really is a good person. Andrew would work to make peace between me and my parents and between me and my sister when we weren't getting along. When things were getting rough at home for me or my sister he intervend and spoke to us both many many times resolving the issue, or making it better. If you know him

like I know him it would be understood that he is not an evil bad person, he is a kind caring person who made mistakes. Andrew is full of goodness. he's the one who convinced me to take out the ten peircings I had, and he is the one who spent hours convincing me to be a religious Jew and he is the one who was always there for me with good advice, he is the one who convinced me to pay back the money I owed my sister, hes the one who calmed me & gave me hope when I was in the hospital, he's the one with whom I could talk for hours and always ready to share something new, like a new band or show or something else, he's the one who cared about me when I felt no one did, he's the one I call my best friend, he's the one who always interjected if he thought he could make peace between two parties, and he's the one that was on my case and convinced me to give up smoking (after smoking heavily for five years). When someone is having issues he tells me to call them & I know he always prays for me, these are just a few examples that come to mind. Andrew is a kind and caring person, who would take a bullet for his friends. Please Please Your Honor see not Andrew as they are making him out to be (a monster) but as I see him as a good person, a kind person and a awesome friend

4/16/15

Honorable Margo K. Brody:

Hello, Judge. I'm glad I have the opportunity to write you this letter, Judge, because I have a lot of things I want to tell you.

I am a 29-year-old woman. I work for the state of New York. I've had this job for seven years, and I love it. I am a single mother of my four-year-old daughter.

I have had the pleasure of knowing Andrew Goodman for the past ten years. He is my ex-husband's best friend, and I met Andrew when I was 19, when my ex and I started dating. Andrew spent a lot of time hanging out with us, and we loved having him around. When my ex and I got married, Andrew was always coming over for Sabbath and holiday meals. Andrew was the only one out of my ex's group of friends that I really felt was my friend too, and I will definitely elaborate on that.

When Andrew would come over for meals, he was always buying food and

ALWAYS offering to help with the preparation and cleanup. He would never let us have him over without in some way paying us for it.

For birthdays for the five years I was married to my ex, he would take us out to a nice dinner in addition to buying us gifts. He was always so super generous, and it's always a quality I loved about him.

So, while Andrew was very generous towards us and we had a ton of fun spending time with him, hanging out, laughing things you do with a close friend, the quality I loved most about Andrew was his respect. He treated everyone with respect. If I can please tell you a specific incident that I still think about years later. It was late Friday night and me, my ex and Andrew had finished eating at a mutual friend's house.

Since we didn't go in the car on Sabbath, it was time to walk home.

My ex wanted to go out and wasn't going to walk me home at 10:00 because he was walking in the other direction to go out. I said it was fine and I'd be okay. Andrew walked me straight to my door and made sure I got in safe.

To me it was a big deal. Never forget it.

Andrew is one of the only people I have even met that will not judge anybody. ~~To~~ ~~On top of that, he~~

On top of that, he is the guy who would be friends with anyone, even the people that are not the easiest or coolest to be friends with. I really admire that so much about him. I was brought up to always be friends with the kid in the class that had no friends. So while everyone would be teasing them, I would be inviting them to my house. This is one of the first qualities I noticed about Andrew. He would include everyone, and would go out of his way to be friends with the people who didn't have any friends. I remember Andrew had one friend in specific that I am thinking of. Very nice guy. He would always invite him to come out with all of us, and you could just see how happy it made this guy to be included and to have a friend like Andrew.

I am writing you this letter, Judge, I am aware Andrew has pleaded guilty to a crime. I still, however, wanted to write you because I really do have have a lot of wonderful things to say about Andrew.

I am going to end with one more story.
When Andrew was in Riker's Island, my
ex asked me if for the holiday of Purim,
if we can go visit Andrew and attend
the party that they have in the jail.
Honestly, I was a little nervous about going
to Rikers. My ex assured me that
me and my daughter (we brought her) would
be safe and that there's a ton of security
and he was right.
After that, there was nothing to think
about. We were going to visit Andrew.
I just knew how happy it would make him
to see us. ~~x~~ Once my ex assured me,
I was ~~excited~~ even looking forward to going.
~~This was something I could do for Andre~~
Just kept thinking how happy he would be
to see us.

Judge, I want to thank you very much
for taking the time to read my letter.

Honorable Margo K. Brody. My name is Shira
I'm a dear friend of Andrew Goodman and
I understand he has plead guilty to a crime.
Andrew has been my friend and close to me.
Him and I have talked on the phone and
corresponded on the Phone when we have a
chance. He's been true, open, and Most
of all helpful to me. I cant tell you how
so many times he's just called to say hi and
made me feel so good, hopeful, selfless, I miss
him. He has true promise! My heart

is with him every day - Words cant
express what he means to me. I belive he
has a beautiful future I want to see him
be what i know he is. I want to see my
beautiful friend live a beautiful happy
life he deserves it so much! Look at my
dear friends heart please!

Sincerly
Shira Chertoff